# EXHIBIT A

# PITNEY HARDIN LLP

JOY HARMON SPERLING
———
DIRECT DIAL NUMBER
973-966-8217

E-MAIL
JSPERLING@PITNEYHARDIN.COM

(MAIL TO)
P.O. BOX 1945
MORRISTOWN, NEW JERSEY 07962-1945
———
(DELIVERY TO)
200 CAMPUS DRIVE
FLORHAM PARK, NEW JERSEY 07932-0950
(973) 966-6300
FACSIMILE (973) 966-1015

NEW YORK, NEW YORK
(212) 297-5800
FACSIMILE (212) 916-2940

BRUSSELS, BELGIUM
32-02-514-54-19
FACSIMILE 32-02-514-16-59

June 16, 2006

<u>VIA TELECOPIER, CERTIFIED AND REGULAR MAIL</u>

Martin V. Asatrian, Esq.
Strasser, Asatrian, Asatrian & Syme LLP
1135 Broad Street, Suite 211
Clifton, NJ 07013

      Re:    Angela Khorozian v. Hudson United Bancorp, et al.
            Docket No. L-2017-06

Dear Mr. Astarian:

       As you know, this firm has been retained to represent TD Banknorth, Inc., individually and as successor by merger to Hudson United Bancorp ("TD Banknorth") in connection with the above matter.

       This letter is provided as a demand that you immediately dismiss the First Amended Complaint (the "Amended Complaint") filed against TD Banknorth. Rather than filing a motion for sanctions, we are sending this letter to you as a courtesy. We will immediately serve you with such a motion if the claims are not dismissed as requested in this letter.

       Although the Amended Complaint is not clear, it seems to assert that TD Banknorth is somehow responsible for certain harm allegedly suffered by your client as a result of her submission of checks to Hudson United Bank ("Hudson") in May of 2000 to be deposited into an account she established in the name of Sugarbank. As I am sure you are aware, those checks were not valid checks and, as a result, your client was arrested, charged and, subsequently, convicted of bank fraud. For the reasons set forth below, the claims against TD Banknorth are frivolous and should be dismissed.

**PITNEY HARDIN** LLP
Martin V. Asatrian, Esq.
June 16, 2006
Page 2

As an initial matter, by letter dated June 5, 2006, I wrote to you to advise that the defendants listed in the caption of your Amended Complaint were incorrect. TD Banknorth, Inc. and Hudson United Bancorp are holding companies and not proper defendants to the action. I further advised you that the proper party should be TD Banknorth, N.A., successor by merger to Hudson United Bank, which was the bank that was involved in the events alleged in the Amended Complaint. My letter has gone unanswered.

There is also a question as to whether your client has standing to bring these claims as the "contract" to which you refer and the checks at issue were submitted for the benefit of Sugarbank, not Ms. Khorozian. As indicated in the Third Circuit's decision affirming the conviction of your client for bank fraud (attached hereto as Exhibit A), the checks at issue were being deposited into an account in the name of Sugarbank. Therefore, your client does not have standing to bring claims for harm allegedly suffered as a result of Hudson's alleged breach of contract or wrongful conduct concerning the checks.

As to the nature of the claims brought, to the extent that the Amended Complaint seeks to allege common law claims, the case law is clear that such claims are displaced by the Uniform Commercial Code ("UCC"). It is well settled that, "[o]nce the Legislature acts, respect for it is a co-equal branch of government requires courts to consider the legislation in determining the limits of judicial action." Alloway v. General Marine Indus., L.P., 149 N.J. 620, 629 (1997). "By enacting the U.C.C., the Legislature adopted a comprehensive system for compensating consumers for economic loss." Id. See also Livingston Bd. of Educ. v. United States Gypsum Co., 249 N.J. Super. 498, 501 (App. Div. 1991).

Indeed, it is well established that "Chapter 3 of the UCC sets forth a comprehensive scheme regulating negotiable instruments in the interest of creating uniformity in financial dealings with such documents." New Jersey Lawyers' Fund for Client Protection v. Pace, et al., 374 N.J. Super. 57, 62 (App. Div. 2005), aff'd, 186 N.J. 123 (2006).[1] See also City Check Cashing, Inc. v. Manufacturers Hanover Trust Co., 169 N.J. 49, 57 (2001) ("The Uniform Commercial Code, augmented by federal regulation, provides a comprehensive framework for allocating and apportioning the risks of handling checks."); accord White Sands Forest Prods., Inc. v. First Nat'l Bank of Alamogordo, 50 P.3d 202, 206

---

[1] While the Pace decision dealt specifically with the statute of limitations set forth in N.J.S.A. 12A:3-118(g), the rationale and holding apply with equal force to the three year statute of limitations in N.J.S.A. 12A:4-111 at issue here.

**PITNEY HARDIN** LLP

Martin V. Asatrian, Esq.
June 16, 2006
Page 3

(N.M. Ct. App. 2002) (In enacting Article 3 of the UCC, the Legislature "carefully crafted a scheme of express statutory liabilities.").

As a result, all common claims included in your client's Amended Complaint are governed solely by the UCC. See City Check Cashing, Inc., 169 N.J. at 58. "Only in very rare instances should a court upset the legislative scheme of loss allocation and permit a common law cause of action." Bank Polska Kasa Opieki, S.A. v. Pamrapo Sav. Bank, N.A., 909 F.Supp. 948, 956 (D.N.J. 1995) (citing Girard Bank v. Mount Holly State Bank, 474 F.Supp. 1225, 1239 (D.N.J. 1979)).

As to the applicable statute of limitations for such claims, N.J.S.A. 12A:4-111 provides that "An action to enforce an obligation, duty or right arising under this chapter must be commenced within three years after the cause of action accrues." In March 2006, the Supreme Court of the State of New Jersey affirmed the New Jersey Appellate Division's holding that, with respect to causes of action on negotiable instruments, the discovery rule does not apply and the applicable statute of limitations begins to run at the time the bank pays on an allegedly forged or improper endorsement. New Jersey Lawyers' Fund for Client Protection v. Pace, et al., 186 N.J. 123 (2006).[2]

Based on the decision in Pace, there can be no argument that the claims raised by your client concerning the submission of the subject checks accrued, at the latest, when she was arrested and formally charged with the knowing submission of fraudulent checks. At that time, she knew she was allegedly harmed. Insofar as that occurred in May or June of 2000, the claims filed in this matter are clearly time barred.

Finally, the findings made by the Third Circuit as to your client's conduct with respect to the same facts included in your Amended Complaint, render her claims frivolous as against TD Banknorth. I assume you are aware that the conduct that you alleged occurred in the Amended Complaint is the precise conduct that the Third Circuit found warranted her criminal conviction and corresponding incarceration. From that decision, it is clear that your client committed bank fraud. The Court made several findings of fact as to her conduct and as to her intent. Those findings are law of the case. Further, your client has been involved in at least one other reported decision where the court found her credibility to be at

---

2 While the Pace decision dealt specifically with the statute of limitations set forth in N.J.S.A. 12A:3-118(g), the rationale and holding apply with equal force to the three year statute of limitations in N.J.S.A. 12A:4-111 at issue here.

**PITNEY HARDIN** LLP
Martin V. Asatrian, Esq.
June 16, 2006
Page 4

issue.  A copy of that decision is attached hereto as Exhibit B.  Thus, there is a real question as to the veracity of the claims made in the Amended Complaint and whether they can be supported by facts.

In light of the foregoing, this letter is notice that TD Banknorth believes that the claims asserted in the Amended Complaint are frivolous and should be dismissed.  If you do not notify us in writing on or before June 22, 2006 at 5:00 p.m. that you agree to dismiss the Amended Complaint, we will proceed accordingly and seek to recover our fees and costs from you and your client.

Very truly yours,

JOY HARMON SPERLING

# Exhibit A

**Westlaw.**

333 F.3d 498
333 F.3d 498, 61 Fed. R. Evid. Serv. 980
(Cite as: 333 F.3d 498)

Page 1

**H**
Briefs and Other Related Documents

United States Court of Appeals,Third Circuit.
UNITED STATES of America
v.
Angela KHOROZIAN, Appellant.
No. 02-2820.

Argued April 24, 2003.
Filed June 23, 2003.
As Amended Aug. 25, 2003.

Defendant was convicted of bank fraud by the United States District Court for the District of New Jersey, William H. Walls, J., and she appealed. The Court of Appeals, Ambro, Circuit Judge, held that: (1) whether defendant had acted with intent to defraud, of kind required under bank fraud statute, was question for jury; (2) denial of defendant's request for continuance, when witness who was traveling to United States from foreign country to testify on her behalf unexpectedly returned to homeland after his wife suddenly died while he was enroute, was not abuse of discretion; (3) refusal to give "honest mistake of judgment" instruction requested by defendant was not abuse of discretion; and (4) sentencing court could rely on face amount of counterfeit checks that defendant presented to bank in order to establish amount of intended loss.

Affirmed.

West Headnotes

**[1] Banks and Banking 52 ⬤⟿509.10**

52 Banks and Banking
   52XI Federal Deposit Insurance Corporation
     52k509 Offenses and Penalties
      52k509.10 k. In General. Most Cited Cases
Subsection of federal bank fraud statute that proscribes any scheme or artifice to obtain property owned by, or under the custody or control of, financial institution by means of false or fraudulent pretenses, representations, or promises underscores breadth of prior subsection, which proscribes any scheme or artifice to defraud a financial institution, and does not set forth independent basis of liability. 18 U.S.C.A. § 1344(1, 2).

**[2] Banks and Banking 52 ⬤⟿509.10**

52 Banks and Banking
   52XI Federal Deposit Insurance Corporation
     52k509 Offenses and Penalties
      52k509.10 k. In General. Most Cited Cases
Sine qua non of bank fraud violation is intent to defraud bank. 18 U.S.C.A. § 1344.

**[3] Criminal Law 110 ⬤⟿1134(3)**

110 Criminal Law
   110XXIV Review
     110XXIV(L) Scope of Review in General
      110k1134 Scope and Extent in General
       110k1134(3) k. Questions Considered in General. Most Cited Cases
District court's conclusions regarding the scope of bank fraud statute were conclusions of law, over which Court of Appeals would exercise plenary review. 18 U.S.C.A. § 1344.

**[4] Banks and Banking 52 ⬤⟿509.25**

52 Banks and Banking
   52XI Federal Deposit Insurance Corporation
     52k509 Offenses and Penalties
      52k509.25 k. Prosecutions. Most Cited Cases
Whether defendant had acted with intent to defraud, of kind required under bank fraud statute, in presenting counterfeit checks to bank and in misrepresenting identity of person who accompanied her on visit to bank as third-party payee and purpose for which she intended to use deposited funds, was question for jury, given evidence that, in spite of various facts alerting defendant to suspicious nature of checks, she had nevertheless proceeded with plan to present checks, and had drawn up fake contract to allay any concerns anticipated from bank personnel, in order to collect her promised $3 million commission for cashing checks. 18 U.S.C.A. § 1344.

**[5] Banks and Banking 52 ⬤⟿509.10**

52 Banks and Banking
   52XI Federal Deposit Insurance Corporation
     52k509 Offenses and Penalties
      52k509.10 k. In General. Most Cited Cases
Defendant acts with fraudulent intent, of kind

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

333 F.3d 498
333 F.3d 498, 61 Fed. R. Evid. Serv. 980
(Cite as: 333 F.3d 498)

Page 2

required under bank fraud statute, if he exhibits a willful blindness in dealings with bank. 18 U.S.C.A. § 1344.

**[6] Banks and Banking 52 ☜509.10**

52 Banks and Banking
    52XI Federal Deposit Insurance Corporation
        52k509 Offenses and Penalties
            52k509.10 k. In General. Most Cited Cases
Defendant need not specifically intend to cause bank a loss in order to violate bank fraud statute; specific intent requirement is satisfied if defendant commits act which could put bank at risk of loss. 18 U.S.C.A. § 1344.

**[7] Banks and Banking 52 ☜509.10**

52 Banks and Banking
    52XI Federal Deposit Insurance Corporation
        52k509 Offenses and Penalties
            52k509.10 k. In General. Most Cited Cases
Mere fact that bank never actually suffers any harm is not defense to prosecution under bank fraud statute; statute requires only that bank be placed at risk of loss. 18 U.S.C.A. § 1344.

**[8] Criminal Law 110 ☜1153(1)**

110 Criminal Law
    110XXIV Review
        110XXIV(N) Discretion of Lower Court
            110k1153 Reception and Admissibility of Evidence; Witnesses
                110k1153(1) k. In General. Most Cited Cases
Court of Appeals reviews district court's evidentiary rulings for abuse of discretion.

**[9] Criminal Law 110 ☜419(2.5)**

110 Criminal Law
    110XVII Evidence
        110XVII(N) Hearsay
            110k419 Hearsay in General
                110k419(2.5) k. "Catch-All" or Residual Exception. Most Cited Cases
"Telefax header" that bank fraud defendant sought to introduce into evidence in attempt to prove, based on date on header, that she had preexisting commercial relationship with third-party payee whose name appeared on counterfeit checks that she sought to cash did not possess sufficient guarantees of trustworthiness, based on evidence as to ease with

which such headers could be fabricated and of defendant's fraudulent conduct, to be admissible over hearsay objection under "catchall" exception to hearsay rule. 18 U.S.C.A. § 1344; Fed.Rules Evid.Rule 807, 28 U.S.C.A.

**[10] Constitutional Law 92 ☜268(3)**

92 Constitutional Law
    92XII Due Process of Law
        92k256 Criminal Prosecutions
            92k268 Trial
                92k268(2) Particular Cases and Problems
                92k268(3) k. Time of Trial in General; Opportunity to Obtain Counsel and Prepare. Most Cited Cases
Although a myopic insistence upon expeditiousness in face of justifiable request for delay can render the right to defend with counsel an empty formality, denial of defendant's request for continuance constitutes an abuse of discretion only when it is so arbitrary as to violate due process. U.S.C.A. Const.Amend. 5.

**[11] Criminal Law 110 ☜597(3)**

110 Criminal Law
    110XIX Continuance
        110k588 Grounds for Continuance
            110k597 Credibility and Probable Effect of Expected Testimony
                110k597(3) k. Evidence Not Changing Result of Case. Most Cited Cases
Denial of defendant's request for continuance, when witness who was traveling to United States from foreign country to testify on her behalf unexpectedly returned to homeland after his wife suddenly died while he was enroute, was not abuse of discretion, where defense counsel conceded that witness was not essential witness and that his testimony would be "extremely limited.".

**[12] Criminal Law 110 ☜1134(3)**

110 Criminal Law
    110XXIV Review
        110XXIV(L) Scope of Review in General
            110k1134 Scope and Extent in General
                110k1134(3) k. Questions Considered in General. Most Cited Cases
Court of Appeals exercises plenary review in deciding whether district court's jury instructions stated the proper legal standard.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

333 F.3d 498
333 F.3d 498, 61 Fed. R. Evid. Serv. 980
(Cite as: 333 F.3d 498)

Page 3

**[13] Criminal Law 110 ⟊1152(1)**

110 Criminal Law
    110XXIV Review
        110XXIV(N) Discretion of Lower Court
            110k1152 Conduct of Trial in General
                110k1152(1) k. In General. Most Cited
Cases
Court of Appeals reviews district court's refusal to give particular instruction, or the wording of instructions given, for abuse of discretion.

**[14] Criminal Law 110 ⟊822(1)**

110 Criminal Law
    110XX Trial
        110XX(G) Instructions: Necessity, Requisites, and Sufficiency
            110k822 Construction and Effect of Charge as a Whole
                110k822(1) k. In General. Most Cited
Cases
On challenge to district court's jury instructions, Court of Appeals considers totality of instructions and not a particular sentence or paragraph in isolation.

**[15] Banks and Banking 52 ⟊509.25**

52 Banks and Banking
    52XI Federal Deposit Insurance Corporation
        52k509 Offenses and Penalties
            52k509.25 k. Prosecutions. Most Cited
Cases
District court's refusal to give "honest mistake of judgment" instruction requested by bank fraud defendant was not abuse of discretion; in charging jurors that any scheme, no matter how deceptive or misleading, cannot be fraudulent if it was carried out in good faith, district court adequately informed jury that defendant's intent was critical to her conviction for bank fraud. 18 U.S.C.A. § 1344.

**[16] Banks and Banking 52 ⟊509.25**

52 Banks and Banking
    52XI Federal Deposit Insurance Corporation
        52k509 Offenses and Penalties
            52k509.25 k. Prosecutions. Most Cited
Cases
"Willful blindness" instruction given by district court in bank fraud prosecution, that government could meet its burden to prove intent through evidence that

defendant made material misstatement of fact with reckless disregard for its truth, was warranted based upon evidence that, despite various facts alerting defendant to suspicious nature of counterfeit checks that she presented to bank, she nevertheless proceeded with plan, and drew up fake contract to allay any concerns anticipated from bank personnel, in order to collect her promised $3 million commission. 18 U.S.C.A. § 1344.

**[17] Banks and Banking 52 ⟊509.10**

52 Banks and Banking
    52XI Federal Deposit Insurance Corporation
        52k509 Offenses and Penalties
            52k509.10 k. In General. Most Cited Cases
"Scheme or artifice to defraud," of kind required under bank fraud statute, may be found where there has been a departure from basic honesty, fair play, and candid dealings. 18 U.S.C.A. § 1344.

**[18] Criminal Law 110 ⟊1158(1)**

110 Criminal Law
    110XXIV Review
        110XXIV(O) Questions of Fact and Findings
            110k1158 In General
                110k1158(1) k. In General. Most Cited
Cases
Court of Appeals reviews for clear error district court's application of "amount of loss" sentencing guideline. U.S.S.G. § 2F1.1, 18 U.S.C.A. (2000).

**[19] Sentencing and Punishment 350H ⟊736**

350H Sentencing and Punishment
    350HIV Sentencing Guidelines
        350HIV(B) Offense Levels
            350HIV(B)3 Factors Applicable to Several Offenses
                350Hk736 k. Value of Loss or Benefit.
Most Cited Cases
Sentencing court could rely on face amount of counterfeit checks that defendant presented to bank in order to establish amount of loss intended by bank fraud scheme, notwithstanding defendant's contention that she did not know that checks were counterfeit and had no intent to cause any loss to bank; where jury found defendant guilty of bank fraud under "willful blindness" or other theory of liability relied upon by government, debtor's intent to cause loss to bank was established. 18 U.S.C.A. § 1344; U.S.S.G. § 2F1.1, 18 U.S.C.A. (2000).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

333 F.3d 498
333 F.3d 498, 61 Fed. R. Evid. Serv. 980
(Cite as: 333 F.3d 498)

**\*501** Herald Price Fahringer(Argued), Erica T. Dubno, Lipsitz, Green, Fahringer, Roll, Salisbury & Cambria, LLP, New York, NY, Ivan Stephan Fisher, New York, NY, for Appellant.
Christopher J. Christie, United States Attorney, George S. Leone, Chief, Appeals Division, Gail Zweig (Argued), Assistant U.S. Attorney, Office of the United States Attorney, Newark, NJ, for Appellee.

Before SCIRICA,[FN*] Chief Judge, AMBRO and GARTH, Circuit Judges.

> FN* Judge Scirica began his term as Chief Judge on May 4, 2003.

## OPINION OF THE COURT

AMBRO, Circuit Judge.
We address the scope of the federal bank fraud statute, 18 U.S.C. § 1344. Angela Khorozian appeals her conviction on the ground that she could not have conspired to commit, and could not have committed, bank fraud by negotiating counterfeit checks because she did not know that those checks were counterfeit. She also alleges various errors in the District Court's evidentiary rulings, jury instructions, and application of the Sentencing Guidelines. We affirm both the conviction and sentence.

## I. Background

In 2000, Khorozian was approached with a moneymaking opportunity by her longtime acquaintance Eduardo Queirolo, a businessman from Brazil. Queirolo told Khorozian that a third person, Mr. Camilo, had presented Queirolo with a scheme in which he could obtain part of a sizable commission-$6 million-if he negotiated $20,398,872 in checks through a bank in the United States. Camilo said the checks needed to be negotiated in the United States to avoid high taxes that would result were they negotiated in Brazil. Queirolo requested Khrozian's assistance in this project. It was agreed that Khorozian would receive $3 million of the commission, Queirolo and Camilio would each receive $1 million, and other unnamed individuals would split the remaining $1 million.

To facilitate negotiation of the checks, Khorozian attempted to open a commercial bank account at Hudson United Bank ("Hudson United").[FN1] To find

out how to open such an account, she spoke with John Demetrius, a personal friend who sits on Hudson United's board of directors. Demetrius, in turn, referred Khorozian to David Yanagisawa, a Senior Vice President at Hudson United.

> FN1. Khorozian and the Government agree that it would have been impossible to negotiate $20 million in checks through a personal account.

Yanagisawa established an account for Khorozian at a meeting in which she made three misrepresentations. First, Khorozian told Yanagisawa that she expected to make the initial deposit via wire transfer. Her statement is significant because a wire transfer is an instantaneous transfer of funds and thus would pose no financial risk to Hudson United. Yanagisawa testified that, had he known the initial deposit would be $20 million in checks, he would **\*502** not have opened the account because of the increased risk. Second, Khorozian represented that she would be using the deposited funds for investment in a sugar plantation in Africa when in fact she had no such plans. Third, she opened the account in the name of "Sugarbank," a New Jersey corporation whose authorization to do business had lapsed due to its failure to pay taxes.

On May 25, 2000, Queirolo received two checks. One was allegedly drawn on the account of Costco Wholesale Corp. and the other on Liberty Carton Co.'s account. The checks were both payable to an individual named Luiz Carlos Teixiera. At trial, Queirolo testified that he verified that the checks were not the result of drug or arms trafficking, that Costco and Liberty Carton had sufficient funds to pay the checks, and that the check numbers were "correct." He was unable to verify whether the signatures on the checks were genuine. Thus, because his investigative resources in Brazil were limited, he asked Khorozian to perform a more thorough investigation in the United States. She agreed and later told him that she investigated the checks and that they were good. On May 30, 2000, Queirolo arrived in the United States with the checks. Khorozian endorsed both checks as payable to Sugarbank.

The next day, Khorozian and Queirolo went to Hudson United to deposit the checks. They were assisted by the Custom Branch Manager, Anthony Moscati. At this meeting, Khorozian introduced Queirolo as "Mr. Teixeira," the individual to whom

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

333 F.3d 498
333 F.3d 498, 61 Fed. R. Evid. Serv. 980
(Cite as: 333 F.3d 498)

Page 5

the checks were payable-a fourth misrepresentation. Moscati showed the checks to Tom Shara, the Executive Vice President in charge of commercial loans, who accepted the checks, but subjected them to a thirty-day hold for verification, given the large sum at stake.

Upon returning home, Khorozian received a fax-sloppily handwritten-instructing her and Queirolo how to distribute the $20 million.  Khorozian and Queirolo had expected that they would be asked to forward the funds to a single bank account, but the fax instead instructed them to wire money to "about five" accounts, some held by individuals with Arabic names.  The fax's unexpected instructions and unprofessional appearance made Khorozian and Queirolo suspicious, according to Queirolo, but they nonetheless proceeded with their plan.  In fact, Queirolo testified that, as a result of the suspicious instructions and because of concerns that Hudson United might become suspicious when asked to effect the transfers, Khorozian drew up a two-page fake "investment contract" between Sugarbank and Teixiera.  The agreement purported to contain the terms of a hotel development project in Africa valued at the exact amount of the two checks.  The contract specified that Sugarbank would receive a 15% commission for its work-less than the agreed-upon $6 million commission, according to Queirolo, to make it appear more credible.

Queirolo testified that he and Khorozian planned to furnish the agreement to Hudson United in the event that anyone at the bank inquired into their intentions with respect to the $20 million deposit.  Khorozian contends, however, that the investment contract was genuine - that there actually was a deal between Sugarbank and Teixiera.  To prove the legitimacy of the agreement and to refute Queirolo's claim that the investment agreement was drafted in response to the suspicious instructions, Khorozian sought to demonstrate at trial that she faxed a copy of the contract to Etembe Kono of the Foundation Elena, a charitable foundation in Cameroon, on May 15 - before Queirolo *503 received the two checks drawn to Teixiera.  She also sought to introduce into evidence a faxed copy of the investment contract to show that the fax header[FN2] was dated May 15. (The District Court refused to admit this fax, however, ruling that it was hearsay.)  Khorozian did not present the investment contract to Hudson United, however.

FN2. A header is a line on the top of the

faxed page generated by the fax machine and containing, among other information, the date on which the fax was sent.

Meanwhile, Hudson United attempted to verify the validity of the two checks by calling Costco and Liberty Carton.  Each confirmed that it did not issue its respective check.  Upon discovering that they were counterfeit, the bank called the FBI, which arrested Khorozian and Queirolo.  Queirolo pled guilty to conspiracy to commit bank fraud and appeared as a Government witness at Khorozian's trial, at which the jury found Khorozian guilty of both bank fraud and conspiracy to commit bank fraud.

At sentencing, the Court believed that the intended Guideline range overstated the severity of Khorozian's offense.  It therefore departed downward from the 51 to 63 month sentence recommended by the United States Sentencing Guidelines ("U.S.S.G.") and imposed a sentence of 18 months in prison on each count to run concurrently.

Khorozian appeals on four grounds: (1) the District Court should have granted her motion for acquittal because she did not know the checks were counterfeit and therefore lacked intent to defraud the bank;  (2) the Court's jury instructions were deficient;  (3) the Court deprived her of due process by refusing to admit a fax copy of the investment contract on hearsay grounds and by refusing to grant a continuance so that a defense witness could travel to testify;  and (4) it erred in basing Khorozian's sentence on $20 million of intended loss under the Sentencing Guidelines because she did not know the checks were counterfeit and therefore had no intent to cause the bank any loss. [FN3]

> FN3. The District Court had jurisdiction under 18 U.S.C. § 3231.  We exercise appellate jurisdiction pursuant to 28 U.S.C. § 1291.

**II. Discussion**

**A. Motion for Acquittal**

[1][2]  The federal bank fraud statute, 18 U.S.C. § 1344, makes it a crime "knowingly [to] execute[ ], or attempt[ ] to execute, a scheme or artifice-(1) to defraud a financial institution;  or (2) to obtain any of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

333 F.3d 498
333 F.3d 498, 61 Fed. R. Evid. Serv. 980
(Cite as: 333 F.3d 498)

the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises." We recently interpreted § 1344 in *United States v. Thomas,* 315 F.3d 190 (3d Cir.2002), holding that both parts of § 1344 must be read conjunctively: "there can be no such thing as an independent violation under subsection (2)." *Id.* at 197. Rather, "the *sine qua non* of a bank fraud violation ... is the intent to defraud the bank." *Id.* at 197; *see also United States v. Blackmon,* 839 F.2d 900, 905-06 (2d Cir.1988) (holding that a conviction under the bank fraud statute requires intent to "victimize a bank"). Were we to read § 1344 disjunctively, "almost any scheme in which a victim withdraws money from a bank and turns it over to the perpetrator would become fair game under the statute. Such a reading ... is irreconcilable with Congressional intent." *Thomas,* 315 F.3d at 196.

*504 [3] Khorozian contends that there is insufficient evidence that she knew the checks were counterfeit and therefore she lacked the requisite intent to defraud Hudson United.  The Government counters that there is sufficient record evidence for a jury to find that Khorozian knew the checks were counterfeit-or at least sufficient evidence to support the contention that Khorozian was willfully blind to the fact that the checks were counterfeit.  In the alternative, the Government argues that a conviction under the bank fraud statute does not require that Khorozian knew the checks were invalid, only that she made material representations to the bank that put it at risk of loss.  As Khorozian's argument concerns the scope of the bank fraud statute, a question of law, our review on this issue is plenary. *Id.* at 195.

[4] We begin by noting that "a claim of insufficiency of the evidence places a very heavy burden on an appellant," *United States v. Dent,* 149 F.3d 180, 187 (3d Cir.1998) (quoting *United States v. Gonzalez,* 918 F.2d 1129, 1132 (3d Cir.1990)), and that we must interpret all facts in the light most favorable to the Government, *United States v. Hart,* 273 F.3d 363, 371 (3d Cir.2001).  The jury could have found that Khorozian was willfully blind to the fact that the checks were counterfeit.    Queirolo instructed Khorozian to verify that the checks were genuine, but she apparently failed to do so.  Had she followed Queirolo's instruction-by telephoning the drawers, for example-she would have discovered that the checks were not drawn by Costco and Liberty Carton.  We point out Queirolo's instruction not because Khorozian had any legal duty to follow it, but rather

because it shows his concerns - expressed to Khorozian-about the scheme's legality.   Aware of Queirolo's concerns, and in light of the fact that she was attempting to negotiate over $20 million in third-party checks payable to an individual she had, according to Queirolo, never met (Teixiera), a jury could have concluded that Khorozian turned a blind eye to the checks' potential invalidity.

[5] Moreover, Khorozian surely became suspicious after receiving the faxed instructions in sloppy handwriting.[FN4]  As discussed, Queirolo testified that the unprofessional-looking fax and the unexpected instructions to disburse funds to multiple accounts with Arabic names (rather than a single account) made him question the transaction's legitimacy. Indeed, that fax made Khorozian so concerned about the transaction that she drafted a fake investment contract to deal with this concern.   In this context, the jury could have inferred that Khorozian remained willfully blind to the checks' validity in order to receive her $3 million share of the commission.   As we discuss below in connection with the jury instructions, willful blindness constitutes sufficient fraudulent intent under § 1344.

> FN4. While, by this time, Khorozian had already attempted to deposit the checks, she could have called Hudson United to alert the bank that the checks might not be genuine.

Even if Khorozian were not deliberately indifferent to whether the checks were counterfeit, the bank fraud statute nonetheless proscribes her actions.    As discussed, Khorozian made four misrepresentations to Hudson United:  she would make the initial deposit by wire transfer;  the $20 million deposit would be invested in a sugar plantation in Africa;  the company for which Khorozian opened the account, Sugarbank, was a corporation in good standing (when in fact it was not);  and Khorozian introduced Queirolo as Teixiera.   Mr. Yanigasawa testified that, merely for the first misrepresentation, he would not have opened the account.   Thus, there is *505 undisputed record evidence that the first misrepresentation is material: but for this false statement, the bank would not have negotiated the two checks.    That misrepresentation was therefore the "first step" in Khorozian's fraudulent scheme that placed the bank at a risk of a loss.[FN5]

> FN5. Had Hudson United actually negotiated the checks, it would have been

subjected to a $20 million loss. *See Univ. Premium Acceptance Corp. v. York Bank & Trust Co.,* 69 F.3d 695, 701 (3d Cir.1995) ("The general rule is a bank that pays on a forged indorsement is liable to the drawer."); *see also* U.C.C. § 3-404(d).

[6][7] The Government's position finds support in *United States v. Moran,* 312 F.3d 480 (1st Cir.2002), in which the First Circuit reversed a district court's judgment of acquittal under analogous circumstances. In *Moran* - the two defendants - an attorney representing a bank in connection with a loan and his wife, a director at the bank - failed to disclose their financial interest in the loan. Importantly, *Moran* held the defendants guilty even though they did not specifically intend to cause the bank a loss (*i.e.,* they intended that the loans would be repaid), but rather intended only to make *misrepresentations* that made a loss more likely. Specifically, because of the lawyer-defendant's relationship to the bank, he "was positioned uniquely to expedite the process by which [the investors] could obtain financing [,] ... for instance by bypassing conventional bureaucratic impediments." *Id.* at 491. *Moran* thus illustrates that § 1344's specific intent requirement is satisfied if an individual commits an act that could put the bank at risk of loss.[FN6]

> FN6. That Hudson United never actually suffered harm is also immaterial to Khorozian's defense. Section 1344 only requires that the bank be placed at risk of loss. *See United States v. Goldblatt,* 813 F.2d 619, 624 (3d Cir.1987) ("[I]t was not necessary for the Government to prove that the intended victim of the fraud was actually defrauded."); *accord Moran,* 312 F.3d at 489. Moreover, in deciding whether an individual has committed bank fraud, we do not consider whether the bank exercised due care in attempting to prevent the loss (as here, by placing a thirty-day hold on the checks in question) or relied on the misrepresentations. *Neder v. United States,* 527 U.S. 1, 24-25, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) ("The common-law requirements of 'justifiable reliance' and 'damages' ... plainly have no place in the federal fraud statutes.").

The cases Khorozian cites are factually distinguishable because those cases involved fraud on a third party where the bank was merely an "unwitting instrumentality" in the fraud rather than the "target of deception." *Thomas,* 315 F.3d at 201 (citation omitted). *Compare id.* at 194, 201-02 (bank not at risk of loss when an individual taking care of an elderly woman fraudulently induced the patient to write checks to her; because the checks were genuine, although obtained from the drawer by fraud, the bank faced no liability); *United States v. Rodriguez,* 140 F.3d 163 (2d Cir.1998) (bank not at risk of loss when a friend of the defendant improperly made the defendant a "vendor" in her employer's database and then wrote checks to her from the company's account); *United States v. Davis,* 989 F.2d 244 (7th Cir.1993) (scheme in which defendant submitted fraudulent tax returns to the IRS in the name of a homeless person, established a business and a commercial account with himself and the homeless person as signatories, and then deposited the tax refunds into the account, is not bank fraud because the bank was at no risk of loss); *United States v. Orr,* 932 F.2d 330, 332 (4th Cir.1991) (opening a bank account in a false name and subsequently drawing the account down to a negative balance is not bank fraud because "[w]hether the account was in [a false name] was not of significance*506 to the giving of checks payable to certain payees and the return of such checks for reasons of insufficient funds.").

We therefore hold that 18 U.S.C. § 1344 proscribes Khorozian's actions.[FN7]

> FN7. We do not consider other arguments Khorozian raised by way of a letter styled under Fed. R.App. Proc. 28(j). Such letters, under the Rule's express terms, may include only citations to supplemental authorities and the reasons for submitting them. Thus, supplemental arguments such as Khorozian has made are out-of-bounds.

### B. Due Process Claims

#### 1. Evidentiary Issue

[8][9] While Kono was on the stand, Khorozian's counsel sought to move into evidence a fax of the (allegedly fake) investment contract Khorozian sent to Kono, at the top of which was a header-allegedly generated by Khorozian's fax machine-bearing the transmission date of May 15.[FN8] Khorozian wanted to establish, through this fax, that the investment contract was drafted on or before May 15 to refute

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

333 F.3d 498
333 F.3d 498, 61 Fed. R. Evid. Serv. 980
(Cite as: 333 F.3d 498)

Page 8

Queirolo's testimony that is was concocted as part of a plan to deceive the bank. She also wanted to show that she and Teixiera had a commercial relationship before May 25, the date that Queirolo received the checks with Teixiera's name on them, to support her contention that she believed the funds were to be used for the investment project described in the fax (and thus that she had no intent to cause the bank loss).

> FN8. The Government had already introduced an English-language version of the purported agreement in its case-in-chief, sans fax header. Khorozian sought to introduce a Portugene-language version that she alleged she faxed to Kono.

The District court refused to admit the fax, ruling that Kono, as the recipient of the fax, was not the proper party to lay a foundation for admitting the transmission and that, in any event, the fax was hearsay. Khorozian argues that the District Court erred and seeks a new trial.

The District Court is mistaken on both counts. The Court was correct that ordinarily a fax's sender would authenticate the document by testifying to such foundational facts as that the fax machine automatically date-stamps transmissions, that it was in proper working order, that she did not tamper with it, *etc. Cf. United States v. Branch, 970 F.2d 1368, 1371 n. 3 (4th Cir.1992)*(setting out as factors relevant to a foundation for admission of a tape recording, *inter alia*, that the device was in proper working order, that no alternations were made to the recording at issue, and that the operator could properly operate the machine). In this case Khorozian exercised her Fifth Amendment right against self-incrimination and thus did not take the stand. However, Kono could-and did-authenticate the fax under Federal Rule of Evidence 901(a) by testifying that she *received* the fax on the date indicated on the header. Authentication does not conclusively establish the genuineness of an item; it is a foundation that a jury may reject.

Moreover, neither the header nor the text of the fax was hearsay. As to the header, "[u]nder FRE 801(a), a statement is something uttered by 'a person,' so nothing 'said' by a machine ... is hearsay." 4 Mueller & Kirkpatrick, *Federal Evidence* § 380, at 65 (2d ed.1994). The fax's contents were not hearsay because Khorozian sought to introduce the fax for the fact that it contained the name Teixiera (and was sent on May 15), not for its truth. The fax is relevant, regardless of its truth, to rebut the Government's contention that she and Queirolo fabricated the document after May 25 as part of a scheme to defraud the bank.

Because the District Court's errors were non-constitutional-misapplication of the Federal Rules of Evidence-we may nonetheless affirm the jury's verdict if we "believe[] ... that it is highly probable that the error did not contribute to the judgment." *McQueeney v. Wilmington Trust Co., 779 F.2d 916, 924 (3d Cir.1985)*(emphasis removed). We do not believe that *507 the jury's verdict would have been different had the fax been admitted. First, the other evidence against Khorozian, discussed above, was significant. Second, even were the fax introduced, it would have been consistent with the rest of the Government's case. Fax headers are easily fabricated by the sender. *See Total Containment, Inc. v. Environ Products, Inc., 921 F.Supp. 1355, 1370 n. 3 (E.D.Pa.1995)*, affirmed in part and vacated in part on other grounds, 1997 WL 16032 (Fed.Cir.1997)("Apparently, a fax burn-in can be rather easily faked. The time and date printed by the machine can be changed merely by resetting the machine."). Queirolo testified that Khorozian intended to bribe an African official to corroborate the fax. Kono may have been that person.

Third, admission of the fax would not meaningfully have aided defense counsel's ability to develop the argument that Khorozian and Teixiera had a business relationship before May 25. Kono testified that she received "a contract between Mrs. Khorozian and her investor ... around the fifteenth [of May.]" Even if in the course of Kono's testimony it was unclear to the jury that the document she allegedly received was the investment contract containing Teixiera's name, in closing argument Khorozian's counsel drew this connection clearly. Defense counsel referred to the allegedly fabricated joint venture agreement between Sugarbank and Teixiera, bearing a date of May 8, which the Government had already introduced into evidence as a "fake." And but a minute later, counsel referred to Kono's testimony. He completed the connection by asking rhetorically: "[H]ow is it that Mrs. Kono could have gotten a copy of that document [on May 15] that wasn't even created until June 1 [according to the Government] when she got all upset about those instructions[?]"

We therefore hold that the District court's error were harmless.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

333 F.3d 498
333 F.3d 498, 61 Fed. R. Evid. Serv. 980
(Cite as: 333 F.3d 498)

Page 9

### 2. Failure to Grant a Continuance

[10][11] Khorozian sought to call Maitra Goudja Abdallah Nassara, a former judge in the Republic of Chad, to testify on her behalf. However, Nassara's wife suddenly died while he was en route. He thus returned to Chad and was unable to testify on the scheduled date. Khorozian argues that the District Court abused its discretion by denying the defense a continuance until Nassara could appear. We review this denial for abuse of discretion. *United States v. Kikumura*, 947 F.2d 72, 78 (3d Cir.1991). Although a "myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality," denying a request for a continuance constitutes an abuse of discretion only when it it "so arbitrary as to violate due process." *Ungar v. Sarafite*, 376 U.S. 575, 589, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964).

We perceive no due process violation. At trial, defense counsel essentially conceded that Nassara would not be an essential witness. Counsel represented that Nassara's "testimony would be extremely limited" and that he would be asked to refer to the investment contract that the Court already refused to admit into evidence. Indeed, counsel said "I choose to rest at this time rather than ask for a delay to permit this witness to come merely to have the crux of his testimony excluded." In this context, counsel appears to have conceded that a failure to procure Nassara's testimony would not rise to the level of a due process violation.[FN9]

> FN9. Khorozian has not argued that the District Court's failure to grant a continuance was plain error, and we do not perceive plain error.

### C. Jury Instructions

[12][13][14] Khorozian further argues that the District Court erred in instructing the jury. We exercise plenary review in determining "whether the jury instructions *508 stated the proper legal standard." *United States v. Coyle*, 63 F.3d 1239, 1245 (3d Cir.1995). We review the refusal to give a particular instruction or the wording of instructions for abuse of discretion. *Id.* Moreover, "when we consider jury instructions we consider the totality of the instructions and not a particular sentence or paragraph in isolation." *Id.*

### 1. Good Faith

[15] Because good faith is a complete defense to fraud charges-negating specific intent-Khorozian requested a jury instruction that "honest mistake of judgment does not rise to the level of an intent to defraud." The District Court declined to give this instruction, instead charging that "regardless of how misleading or deceptive a plan may be[,] it is not fraudulent if it was carried out in good faith." We discern no meaningful difference between the proposed instruction and the instruction issued. Had Khorozian made an "honest mistake of judgment," it necessarily was in "good faith." The instruction's wording that, "regardless of how misleading or deceptive a plan may be" as to the bank, it is not fraudulent if "carried out in good faith" adequately informed the jury that Khorozian's intent was critical to her conviction for bank fraud.

### 2. Intent to Defraud

[16] Khorozian also contends that the Court misinstructed the jury by charging that "the government may meet its burden to prove intent through evidence that the defendant made a material misstatement of fact with reckless disregard for the truth." She complains that "[t]his instruction emasculated the specific intent to defraud mandated by § 1344." We see no error. Although this particular statement, taken out of context, may not employ the exact language as used in *Thomas*, the jury instructions, taken as a whole, did communicate to the jury that it must find that Khorozian possessed the specific intent to defraud and put Hudson United at a risk of loss.

A "willful blindness" instruction "allows the jury to impute the element of knowledge to the defendant if the evidence indicates that he purposely closed his eyes to avoid knowing what was taking place around him." *United States v. Schnabel*, 939 F.2d 197, 203 (4th Cir.1991). "We have upheld a district court's willful blindness instruction where the charge made clear that the defendant himself was subjectively aware of the high probability of the fact in question, and not merely that a reasonable man would have been aware of the probability." *United States v. Stewart*, 185 F.3d 112, 126 (3d Cir.1999) (internal quotation marks omitted). A willful blindness instruction also is proper when "[t]he jury could have found that [the defendant] deliberately closed his eyes to what otherwise would have been obvious to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

333 F.3d 498                                    Page 10
333 F.3d 498, 61 Fed. R. Evid. Serv. 980
(Cite as: 333 F.3d 498)

him." *Id.; accord United States v. Singh,* 222 F.3d 6, 11 (1st Cir.2000) ( "A willful blindness instruction is justified when the defendant claims to lack guilty knowledge, yet the evidence, taken in the light most favorable to the government, suffices to support an inference that he deliberately shut his eyes to the true facts."). As we previously concluded, the evidence supported such an inference in this case. Therefore, the District Court properly issued the willful blindness instruction.

### 3. Scheme or Artifice to Defraud

[17] Khorozian objects as well to the District Court's instruction with respect to the meaning of "scheme or artifice to defraud." The Court instructed that a scheme or artifice to defraud may be found "where there has been a departure from basic honesty, fair play and candid dealings"-an instruction Khorozian argues is too vague as applied in her case. We approved such a definition in *United States v. Goldblatt,* 813 F.2d 619 (3d Cir.1987); *accord Moran,* 312 F.3d at 489. Moreover, the jury charge viewed as a whole clearly instructed the jurors that they needed to find specific intent to defraud\*509 in order to convict. Thus we disagree yet again with Khorozian.

### D. Sentencing Guidelines

[18] Khorozian also contests the District Court's application of U.S.S.G. § 2F1.1, regarding amount of loss, to calculate her sentence. [FN10] Because the bank suffered no actual loss, the Court necessarily sentenced Khorozian based on the loss she intended. *See* U.S.S.G. § 2F1.1 cmt. n. 8 ("[I]f an intended loss that the defendant was attempting to inflict can be determined, this figure will be used if it is greater than the actual loss."). She argues that, because she did not know the checks were counterfeit, she intended no loss and thus the District Court erred in finding that $20 million was the amount of loss. *See United States v. Geevers,* 226 F.3d 186, 192 (3d Cir.2000) ("It is clear that a district court errs when it simply equates potential loss with intended loss without deeper analysis."). We review the District Court's application of § 2F1.1 for clear error. *United States v. Evans,* 155 F.3d 245, 252 (3d Cir.1998).

FN10. U.S.S.G. § 2F1.1 has since been deleted and consolidated with § 2B1.1. The

former § 2F1.1 can be found at Appendix C, Amendment 617 of the U.S.S.G.

[19] In this context, the District Court did not err. Because we hold that the bank fraud statute reaches Khorozian's conduct-and the jury found her guilty under the statute-Khorozian intended to cause the bank loss. The Government set out a *prima facie* case of intended loss by showing that the two checks Khorozian attempted to negotiate had a face value of approximately $20 million. Khorozian did not offer any evidence to disprove this amount of loss. Thus, the Government met its burden to prove the amount of loss. *See Geevers,* 226 F.3d at 194 ("[T]he government's presentation of the face value as evidence may make a prima facie case that the defendant intended to cause the full loss of those amounts.... Once the government presented this information to the District Court ... the Court was free to accept the loss figure in the absence of persuasive evidence from [the defendant] that his intent was to steal a lesser amount.").

\* \* \* \* \*

We hold that a jury could have found Khorozian willfully blind to the counterfeit checks and that 18 U.S.C. § 1344 proscribes Khorozian's misrepresentations to Hudson United. The District Court did not deprive Khorozian of due process by refusing to admit a faxed copy of the investment contract or by refusing to grant a continuance for a witness to testify. Moreover, the Court's jury charge was proper and it correctly applied U.S.S.G. § 2F1.1 in sentencing Khorozian. We therefore affirm.

C.A.3 (N.J.),2003.
U.S. v. Khorozian
333 F.3d 498, 61 Fed. R. Evid. Serv. 980

Briefs and Other Related Documents (Back to top)

• 2003 WL 24046275 (Appellate Brief) Reply Brief for Appellant (Jan. 10, 2003) Original Image of this Document (PDF)
• 2002 WL 32828561 (Appellate Brief) Brief for Appellee (Dec. 12, 2002) Original Image of this Document (PDF)
• 2002 WL 32828560 (Appellate Brief) Brief for Appellant and Appendix - Volume I of II (Pages A-1 to A-8) (Oct. 30, 2002) Original Image of this Document with Appendix (PDF)
• 02-2820 (Docket) (Jun. 28, 2002)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

333 F.3d 498                                                                    Page 11
333 F.3d 498, 61 Fed. R. Evid. Serv. 980
(Cite as: 333 F.3d 498)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit B

1159611A01061506

973 854 2961          New Jersey Law Journal                    11:03:59 a.m.    06-14-2006        2/15

*31-2-3105*

NOT FOR PUBLICATION WITHOUT THE APPROVAL
OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
A-3131-01T3


ANGELA KHOROZIAN,

      Plaintiff-Appellant,

      and

VAROUJAN KHOROZIAN,

      Plaintiff,

      v.

DAO ZHONG LIU, SHERRY LIU, and
QIANG ZHOU,

      Defendants-Respondents.

_____

      Argued March 3, 2003 - Decided MAR 1 3 2003

      Before Judges Petrella and Lintner.

      On appeal from the Superior Court of New
      Jersey, Law Division, Bergen County, L-289-
      00.

      Matthew M. Keshishian argued the cause for
      appellant.

      Marie Seitz argued the cause for respondents
      (Heim & McEnroe, attorneys; Marie Seitz on
      the brief).

PER CURIAM

On January 12, 2000, plaintiff Angela Khorozian[1] filed a
complaint in the Law Division against defendants Dao Zhong Liu,
Sherry Liu and Qiang Zhou.  She alleged that on March 31, 1999,
defendants' dog attacked her on a public street and defendants
were liable under both common law negligence and the "dog bite"
statute, N.J.S.A. 4:19-16.[2]  Defendants filed their answer on
April 26, 2000, denying plaintiff's allegations and asserting
contributory negligence.

At the close of evidence, the judge granted defendants'
motion for a directed verdict on plaintiff's negligence claim,
finding that the case fell within the purview of the "dog bite"
statute.  Plaintiff's motion for a directed verdict on her
statutory claim was denied, following which, after forty-five
minutes of deliberation, a jury unanimously found that
defendants' dog did not bite plaintiff.  Plaintiff's motion for a
judgment notwithstanding the verdict or, in the alternative, a
new trial was denied, and this appeal followed.  We affirm.

---

[1]Varoujan Khorozian, Angela's husband, was also included as
a plaintiff in the complaint because he was seeking per quod
relief.  This count was withdrawn during trial, however, so any
future references to "plaintiff" refer solely to Angela
Khorozian.

[2]Plaintiff also alleged that she again encountered
defendants' dog on October 29, 1999, this time on her own
property but, prior to trial, the judge disallowed plaintiff from
seeking damages as a result of this incident.

2

We recite only those facts necessary for the disposition of this appeal.  On the morning of March 31, 1999, plaintiff arrived at the construction site of the house she was having built in Alpine for herself and her husband and for which she was general contractor.  Shortly thereafter, she took her dog, a Lhasa Apso, for a walk.  While on Autumn Terrace, a cul-de-sac that runs into plaintiff's property, she noticed five dogs barking and jumping behind a fence on the property owned by defendants Sherry Liu and Qiang Zhou.  Describing the enclosure in which the dogs were located as a "corral," plaintiff testified that there was a chain link fence on the street side of the property and another chain link fence, approximately three feet behind the street-side fence, surrounding the property.  The street-side fence was six to eight feet high and thirty or thirty-five feet away from where plaintiff was walking.  A sign on the fence stated that attack dogs were present.

Plaintiff gave the following version of the events that occurred next.  One of the dogs, a Rottweiler, climbed over the street-side fence and ran toward plaintiff.[3]  As the dog

---

[3] On cross examination, however, plaintiff admitted that she only saw the dog put his paw on the fence but that she did not actually see the dog climb over because she was running in the opposite direction.

3

973 854 2961      New Jersey Law Journal

approached her, she tried to calm it by saying "nice doggie" as she backed away.  All of a sudden, the dog leapt onto plaintiff throwing her to the ground.  The dog proceeded to bite and scratch her all over her body, including her head, torso, thigh and buttocks.  Plaintiff broke loose, kicked the dog, and started running, with the dog chasing after her.  She managed to jump into and hide in a thicket of thorny bushes with the Rottweiler "barking and growling and going from one side to the other side . . . trying to find a way to . . . come into the bushes."  Eventually the dog went away.

Plaintiff contacted the Alpine Building Department on her cell phone and advised them of her location.  After some time, Sergeant Michael LaViola of the Alpine Police Department arrived on the scene, however, he did not see any dog.  Plaintiff emerged from the bushes and ran up to the patrol car.  LaViola was unable to get a detailed account of what occurred because plaintiff was "hysterical" and "crying."  Plaintiff managed to tell LaViola that she was bitten on her thigh and buttocks.  LaViola asked plaintiff if she wanted him to get medical attention, but she declined.  LaViola did not observe any injuries, nor did plaintiff appear disheveled.  He admitted, however, that the areas where she claimed to have been injured were clothed.

4

Plaintiff asked LaViola to drive her back to the construction site, so he placed her in the back seat of the patrol car. Lieutenant Charles Yannetti also responded to the scene and stopped his car next to LaViola's. Yannetti glanced at plaintiff but did not notice any injuries. He indicated that he could only see the top half of plaintiff's body and that the window was slightly tinted. He did notice that her eyes were full of tears and her face was flushed.

LaViola drove plaintiff back to the construction site. Steve Houston, one of the subcontractors, described plaintiff as being "in bad shape," her "hair just crazy," "mascara all over her face," and looking as if "she had been in a fight." Houston wiped plaintiff's face with wet paper towels and noticed some blood on the paper towels. He also saw a fresh cut on the right side of plaintiff's nose.

Plaintiff's husband, Varoujan Khorozian, was called and told that plaintiff had been attacked by a dog. He arrived shortly thereafter and found his wife "screaming and shaking" with a "scratch on her face." Plaintiff testified that she went directly from the construction site to see her doctor, Robert Adair, but her husband testified that he took her home first before she went to see the doctor. Neither plaintiff nor her

5

husband could recall whether he accompanied her to the doctor's office.

Plaintiff arrived at Dr. Adair's office about one or two hours after the incident.  Adair gave her a sedative, some pain and anti-inflammatory medication and a tetanus shot.  She told Adair that she was injured on her right buttock and right leg. She did not receive any stitches.  Plaintiff then went home and lay in bed.  She testified that her

> entire body hurt.  The bite marks in [her]
> back and [her] legs and [her] arm, [her]
> fingers, and [her] head hurt because of . . .
> the hair, [she] found that [her] hair — was a
> chunk was almost missing.  [Her] face hurt,
> [her] neck, [she] had big scratch marks
> throughout all the way through [her] breast.
> The skin wasn't torn, but they were . . .
> scratch marks, it was swollen, you could see
> it is red marks.

She also testified that she had puncture marks all over her body.

LaViola's police report did not indicate that plaintiff appeared injured.  He testified that he would have included such information in his report had there been evidence of injury. Although LaViola advised plaintiff to call him after she went to the doctor so that he could report any injuries, he never received a call.

In July 2000, plaintiff consulted a plastic surgeon, Dr. Charles Garbaccio, about the scarring on her nose.  Garbaccio

described the scar on the right side of her nose and inner part of her eye as "hypertrophic" (raised) and noticeable at a "conversational distance" of three feet. Garbaccio also found some scarring on the left side of the nose and also some bone abnormality in this area. He stated that these injuries were related to the alleged dog bite. As of the time of trial, plaintiff had not received any treatment from Garbaccio.

Dr. Richard Bloomenshen, a board certified plastic surgeon, examined plaintiff on behalf of defendants. He observed a 1.5 x 1 centimeter scar "with slight irregularity" starting at the inner corner of plaintiff's right eye and extending at a right angle towards the right side of her nose. On the left side of her nose was a 1 centimeter x 1 millimeter scar. He stated that these scars were not noticeable at a conversational distance. After examining plaintiff at trial, Bloomenshen testified that "the scar on the right side look[ed] more pink and somewhat thicker from what [he] recall[ed] and . . . [saw] in [his] photographs." He also testified that, based on plaintiff's version of events, the scarring "appeared to be causally related" to the March 1999 dog bite incident. However, he further added that he would "expect a patient who had been viciously attacked by a Rottweiler and bitten repeatedly over various parts of her

7

body to require sutures" and to have a "torn irregular open

bloody irregular kind of wound."

On cross examination, plaintiff admitted that she had been

involved in a previous automobile accident in which she received

trauma to her face.  As a result of the accident, the "top of

[her] nose was bleeding" and her face was bruised.  The accident

"did something to [her] nose," which plaintiff described as a

deviated septum.  Plaintiff did not advise either Dr. Garbaccio

or Dr. Bloomenshen of the prior trauma to her nose.

Deposition testimony of defendants, read into evidence by

plaintiff, revealed that defendant Dao Zhong Liu owned a

Rottweiler in March 1999 and that the dog was staying at the

house owned by his daughter, Sherry Liu, and her husband, Qiang

Zhou.  The deposition also revealed that Zhou was aware that the

dog occasionally got loose from the property, but he could not

remember the dates.

On appeal, plaintiff contends that the trial judge erred in

denying her post-trial motions for judgment notwithstanding the

verdict and/or a new trial because:  (1) the evidence that

plaintiff was bitten by defendants' dog was uncontroverted; and

(2) defendants' expert admitted that plaintiff's injuries were

caused by a dog bite.  We disagree.

The "dog bite" statute, N.J.S.A. 4:19-16, provides in

pertinent part:

> The owner of any dog which shall bite a
> person while such person is on or in a public
> place, or lawfully on or in a private place,
> including the property of the owner of the
> dog, shall be liable for such damages as may
> be suffered by the person bitten, regardless
> of the former viciousness of such dog or the
> owner's knowledge of such viciousness.

In order to satisfy her burden under the statute, plaintiff must

prove that:  (1) defendants owned the dog; (2) plaintiff was

bitten by the dog; and (3) plaintiff was "in a public place, or

lawfully on or in a private place, including the property of the

owner of the dog."  DeRoberts v. Randazzo, 94 N.J. 144, 151

(1983); Pingaro v. Rossi, 322 N.J. Super. 494, 503 (App. Div.

1999).  Satisfaction of these elements imposes strict liability

on defendants.  Ibid.  It is not disputed on appeal that

defendants owned the Rottweiler or that if plaintiff was attacked

it occurred in a public place.  The sole factual issue is whether

plaintiff was bitten by defendants' dog.

In considering the propriety of a motion for judgment

notwithstanding the verdict, we apply the following standard of

review:  "[I]f, accepting as true all the evidence which supports

the position of the party defending against the motion and

according him the benefit of all inferences which can reasonably

9

and legitimately be deduced therefrom, reasonable minds could differ, the motion must be denied." Dolson v. Anastasia, 55 N.J. 2, 5 (1969). A motion for new trial should be granted only where it clearly and convincingly appears that there was a miscarriage of justice under the law. R. 4:49-1; R. 2:10-1. We must defer to the trial judge's findings respecting "intangibles" not transmitted by the record, such as credibility, demeanor and the "feel of the case." Carrino v. Novotny, 78 N.J. 355, 360-61 (1979); Baxter v. Fairmont Food Co., 74 N.J. 588, 597-98 (1977). We apply essentially the same standard in our review of a trial judge's decision. Luczak v. Township of Evesham, 311 N.J. Super. 103, 108 (App. Div. 1998).

Applying these principles, we perceive no sound basis to disturb the trial judge's denial of plaintiff's motion. Denying plaintiff's motion, the trial judge noted that the "issue of credibility of the witnesses, and in particular the plaintiff, is for the jury to decide." Here, the jury's determination, which called into question plaintiff's credibility, should not be disturbed. The record reflects both inconsistencies and equivocations in plaintiff's version. For example, plaintiff initially only complained of injuries to her right buttock and leg but later stated that she was bitten and scratched all over

10

her body.  She could not remember if she was bleeding as a result
of the alleged attack, and her explanation concerning the manner
by which the Rottweiler got loose was at best questionable.
Furthermore, she was the only one who saw the dog at the scene.
At depositions, plaintiff testified that one of the officers
corralled the dog at the scene upon arrival.  However, at trial,
when confronted with her deposition, she equivocated, saying that
she did not see either officer attempt to corral the dog.

Moreover, there was substantial credible evidence refuting
plaintiff's version of the event.  Neither police officer noticed
any injury to plaintiff's face nor did they observe that her
clothing was torn.  Plaintiff did not receive any sutures for her
injuries, which defendants' expert testified would have been
consistent with a vicious dog attack.  Defendants' expert did not
unequivocally state that plaintiff's injuries were caused by the
dog bite; he merely stated that they "appeared to be causally
related."  Further, his opinion, as well as the opinion given by
plaintiff's own expert, were based on the history given by
plaintiff, which significantly omitted the prior trauma she
sustained to her nose in an automobile accident.  An expert's
opinion is no better than the facts upon which the opinion is
based.  Polyard v. Terry, 160 N.J. Super. 497, 511 (App. Div.

11

1978), aff'd, 79 N.J. 547 (1979). Plaintiff's contentions and
arguments that the trial judge erred in denying her motion for
judgment notwithstanding the verdict and new trial lack
sufficient merit to warrant further discussion in a written
opinion.  R. 2:11-3 (e)(1)(B) and (C).

    In addition to her motion for judgment notwithstanding the
verdict and new trial, plaintiff sought the opportunity to
interview the jury, alleging the following four incidents of jury
tampering: (1) in the corridor outside the courtroom, while
jurors were walking by, colleagues of defense counsel were making
references to plaintiff's "mugshots" in a federal criminal matter
that the trial judge prohibited the defense from using until they
were shown to the court; (2) these same individuals were making
references to plaintiff's "mugshots" in the courtroom, to which
the jurors may have been exposed; (3) before voir dire, defendant
Sherry Liu was talking to the person who eventually was selected
as juror number four and that after the jury delivered its
verdict that juror winked at Liu; and (4) defense counsel had a
copy of plaintiff's indictment in a federal criminal matter on
the counsel table in plain view of the jury.  Defense counsel and
her associates submitted certifications in response to
plaintiff's motions denying the three allegations that implicated

12

their conduct.  Denying plaintiff's request, the trial judge

reasoned:

> Good cause has not been shown to warrant this
> relief.  The certifications submitted by
> attorneys, who are officers of the Court,
> refute plaintiff's allegations entirely.
> Interestingly enough, nothing was ever
> brought to the Court's attention during the
> trial by plaintiff of these allegations.
> Plaintiff raises the issue for the first time
> as part of a post trial motion, after the
> jury verdict.  The appropriate time would
> have been for plaintiff to raise the issue
> during trial, when plaintiff contends this
> occurred, so that the Court could have made
> appropriate inquiries then.

R. 1:16-1 provides that no party or attorney shall interview

a juror subsequent to trial "[e]xcept by leave of court granted

on good cause shown."  "'[C]alling back a juror for interrogation

after they have been discharged is an extraordinary procedure

which should be invoked only upon a strong showing that a

litigant may have been harmed by jury misconduct.'"  State v.

Bey, 161 N.J. 233, 291-92 (1999) (quoting State v. Loftin, 146

N.J. 295, 382 (1996)) (alteration in original).  The standard for

reviewing such determinations is abuse of discretion.  See State

v. Scherzer, 301 N.J. Super. 363, 496 (App. Div.), certif.

denied, 151 N.J. 466 (1997).

All four of plaintiff's allegations of jury tampering

implicate conduct that occurred prior to or during trial.  The

972 854 2961          New Jersey Law Journal          11:08:24 a.m.     06-14-2006       15/15

trial judge correctly reasoned that the information should have

been presented at the time it was discovered.  Id. at  495.  "Not

having expressed an objection at the time, [plaintiff] was left

with potentially reversible error, never called to the judge's

attention, remaining in the case, preserved for assertion if a[n]

[unfavorable] verdict were to be returned, but subject to waiver

if a [favorable] verdict ensued."  Tirrell v. Navistar Int'l

Inc., 248 N.J. Super. 390, 405 (App. Div.), certif. denied, 126

N.J. 390 (1991).  To allow plaintiff to sit on her rights would

result in a disservice to the notion of judicial economy.  Under

the circumstances presented, we are satisfied that the trial

judge did not abuse his discretion in declining to initiate this

"extraordinary procedure."

    Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

*Jim Flynn*

CLERK OF THE APPELLATE DIVISION